IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : CRIMINAL ACTION |
| vs. | : |
| | : NO.  06-CR-582-3, 4 |
| HUMBERTO PRECIADO-AVILA and | : |
| | : |
| PEDRO GUTIERREZ | : |

## MEMORANDUM OPINION & ORDER

GOLDEN, J.                                                                                          SEPTEMBER 12, 2007

Before the Court is defendant Pedro Gutierrez's motion to suppress items seized during the execution of a warrant to search a residence in Fontana, California.  Co-defendant Humberto Preciado-Avila joins in the motion.  The Court denies the motion for the reasons that follow.

## BACKGROUND

Because the outcome of this motion depends on the sufficiency of the affidavit supporting the warrant, the Court will confine its analysis to the facts in the affidavit.  See Illinois v. Gates, 462 U.S. 213, 236 (1983) ("we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review.").  A California magistrate judge issued the warrant in question on the basis of the sworn affidavit of Drug Enforcement Administration ("DEA") Special Agent Paul Varghese.  See Aff. of Paul Varghese at 1 (Docket Document No. 306-2).  Varghese joined the DEA in August 2004 and he is presently assigned to the Los Angeles Field Division.  Id. at 2. Prior to joining the DEA, Varghese spent six years with the Dallas Police Department, where he participated in narcotics investigations and developed an understanding of the methods by which narcotics traffickers conduct their business and conceal their activities.  Id.  Since joining the DEA, he has assisted in several investigations with senior

agents and task force officers involving the importation and exportation of illegal drugs, narcotics manufacture, possession, and distribution, and money laundering.  Id.  Through these investigations, Varghese has developed a familiarity with the methods of drug traffickers in general, and with the practices of Mexican drug traffickers in particular.  Id.

The affidavit outlined a *modus operandi* for drug traffickers based upon Varghese's knowledge and experience, stating that they often:

(1)     Use multiple locations to store narcotics, money, and other drug assets;

(2)     Conceal caches of drugs, drug paraphernalia, jewelry, supplier and customer lists, cutting materials, and other contraband at their residences;

(3)     Maintain documents related to money laundering;

(4)     Travel in conjunction with their illegal activities;

(5)     Maintain weapons, including firearms, at their residences; and

(6)     Maintain telephones, cellular phones, pagers, facsimile machines, and computers used to facilitate narcotics trafficking at their residences.

Id. at 3-4.  Drug traffickers often hold such items for an extended period of time because of their long-term nature.  Id. at 3-5.

DEA agents in the Los Angeles Field Division worked in conjunction with agents in the DEA Philadelphia Field Division in the investigation of Roger Ortega and his narcotics associate Humberto Preciado-Avila.[1]  Id. at 5.  Varghese is familiar with all aspects of the investigation of Preciado-Avila.  Id. at 3.  Pursuant to that investigation, agents obtained court orders to intercept communications on at least two telephones that Ortega used, and at least two telephones that Preciado-Avila used.  Id. at 5-6.

---

[1] Roger Ortega is a co-defendant in this action, but does not join in the motion to suppress.

The intercepted calls contained coded language. Id. at 6. Using the knowledge and experience he set forth in the affidavit, Varghese deciphered the calls, which revealed that Ortega and Preciado-Avila were negotiating a large drug transaction during the summer of 2006. See id. at 6-8. They spoke at least seven times between May and September 2006 regarding which narcotics suppliers Preciado-Avila would use, where Ortega and Preciado-Avila could meet in person to negotiate, Ortega's travel from Pennsylvania to California, and Preciado-Avila's confirmation that a drug courier had left California for Pennsylvania. See id. DEA agents also conducted visual surveillance on Ortega and Preciado-Avila, witnessing Ortega travel to California to meet with Preciado-Avila, and Preciado-Avila taking Ortega to the airport after a suspected meeting. See id. at 8. Based on this information, Varghese believed that Ortega and Preciado-Avila were part of an ongoing narcotics trafficking ring, and evidence of their illegal activities would be found at Preciado-Avila's residence. Id. at 2.

The surveillance also supported Varghese's belief that Preciado-Avila resided in the Fontana residence. Preciado-Avila was observed returning to the residence after taking Ortega to the airport. Id. at 8. Agents obtained a court order allowing them to use Global Positioning System ("GPS") satellites to "ping" specific cellular telephones and receive the location of those phones. Id. at 8-9. Using the GPS pings, agents confirmed that what was believed to be Preciado-Avila's cellular phone was in the Fontana residence at 11:55 P.M. on September 14, 2006, and again at 6:00 A.M. the next morning. Id. At 10:00 A.M. on September 15, agents witnessed Preciado-Avila drive out of the garage of the Fontana residence, and they stopped him for a traffic violation shortly thereafter, where he provided a Mexican Identification Card bearing the name Humberto Preciado-Avila. Id. After agents released Preciado-Avila from the stop, they

3

pinged his phone again, and received a response from the cellular phone tower nearest to where Preciado-Avila had been stopped. Id. Based on the visual surveillance, the location of Preciado-Avila's cellular telephone on September 14 and 15, and the traffic stop, Varghese believed that Preciado-Avila resided in the Fontana residence in question, and conducted drug trafficking activities with the cellular phone he kept in that residence. Id. On September 18, 2006, law enforcement officials executed a search warrant at the Fontana residence.

## STANDARD OF REVIEW

A magistrate judge may find probable cause to issue a warrant where, after considering the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. This Court must uphold the magistrate's probable cause finding if the affidavit on which it was based provided a substantial basis for his conclusion that a search would uncover evidence of wrongdoing. Id. at 236. It is unnecessary to determine whether probable cause actually existed, only whether the magistrate had a substantial basis for believing it existed. United States v. Jones, 994 F.2d 1051,1055 (3d Cir. 1994). The Court confines itself to the facts before the magistrate, and does "not consider information from other portions of the record" so as to avoid improper *de novo* review. Id. The "resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." Id. at 1057-58 (*quoting* United States v. Ventresca, 380 U.S. 102, 109 (1965)).

## ANALYSIS

Defendants argue that (1) the warrant did not establish a sufficient nexus between the alleged criminal activity and the Fontana residence; and (2) the warrant was a "general warrant"

in violation of the Fourth Amendment's particularity requirement.  In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court announced the "good faith exception" to the Fourth Amendment exclusionary rule, under which evidence resulting from law enforcement officials' good faith reliance on a warrant later determined to be constitutionally deficient should not be suppressed.  Id. at 906. Where a motion to suppress evidence obtained from the execution of a warrant does not present a novel question of law that should be decided in order to guide future law enforcement officers and magistrates, it is appropriate for the reviewing court to turn directly to consideration of the officers' good faith reliance on the warrant.  Id. at 925.  The Court will do so here, just as the Third Circuit did in a prior case where, as is true here, the defendant argued that the affidavit insufficiently established a nexus and that the warrant did not particularly describe the things to be seized.  See United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents, 307 F.3d 137, 145 (3d Cir. 2002) (hereinafter Ninety-Two Thousand).

To determine the applicability of the good faith exception, a Court asks "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."  United States v. Loy, 191 F.3d 360, 367 (3d Cir. 1999).  The existence of a signed search warrant generally "suffices to prove that an officer conducted a search in good faith."  United States v. Hodge, 246 F.3d 301, 308 (3d Cir. 2001).  There are nonetheless "four narrow situations" in which reliance on a warrant is unreasonable:

(1) when the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;

(2) when the magistrate judge abandoned his judicial role and failed to perform in a neutral and detached manner;

(3) when the warrant was based on an affidavit so lacking in indicia of probable cause as to render any belief in its existence unreasonable; or

(4) when the warrant was so facially deficient that it failed to particularize the place to be searched or things to be seized.

<u>Ninety-Two Thousand</u>, 307 F.3d at 146. In the present case, defendants do not assert that the affidavit was false or that the magistrate abandoned his judicial role. Instead, they argue that the third and fourth exceptions apply.

### 1. Indicia of Probable Cause

The Court is unpersuaded that the challenged affidavit is so deficient as to render reliance on it unreasonable. Examination of the affidavit reveals a substantial showing of probable cause upon which an objectively reasonable officer could have relied. The affidavit set out the affiant's background and experience in law enforcement. <u>Aff. of Paul Varghese</u> at 2. It included a statement of the *modus operandi* of drug traffickers. <u>Id.</u> at 3-5. The document outlined a series of telephone calls concerning the negotiation and coordination of a large drug transaction. <u>Id.</u> at 6-8. It contained reports of surveillance on the relevant individuals and property. <u>Id.</u> at 7-8. Finally, it detailed the use of GPS pings and visual surveillance to confirm that defendant Preciado-Avila lived at the suspected residence. <u>Id.</u> at 8-9. Based on such facts, it is apparent "that the affidavit was not a 'bare bones document' and that the officers' reliance on the search warrant was objectively reasonable." <u>Ninety-Two Thousand</u>, 307 F.3d at 147 (internal citations omitted).

Defendants argue that the affidavit does not establish a sufficient nexus between the alleged wrongdoing and the Fontana residence because it contains no direct evidence of contraband at the residence. This argument is unhelpful to defendants because "[d]irect evidence

linking the place to be searched to the crime is not required for the issuance of a search warrant." United States v. Conley, 4 F.3d 1200, 1207 (3d Cir. 1993). A magistrate "is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." United States v. Whitner, 219 F.3d 289, 296 (3d Cir. 2000). As such, it "is reasonable to infer that a person involved in drug dealing on such a scale would store evidence of that dealing at his home." Hodge, 246 F.3d at 306.

Defendants also challenge Varghese's interpretations of what he believed to be coded language in their telephone conversations. This argument overlooks the fact that Varghese provided the source of his knowledge and experience concerning the methods of Mexican drug traffickers in the affidavit, Aff. of Paul Varghese at 2-3, and that a magistrate is entitled to rely on such representations in an affidavit when determining whether to issue the warrant. See Gates, 462 U.S. at 238 (explaining that a magistrate's decision to issue the warrant may be based in part on the "basis of knowledge" of the individuals supplying facts in the affidavit). Even assuming that some of Varghese's decoding was mistaken, it does not render the warrant invalid because "[e]very statement in a warrant affidavit does not have to be true," United States v. Canfield, 212 F.3d 713, 717 (2d Cir. 2000) (internal quotations omitted), as the magistrate's decision is only subject to a totality of the circumstances review. See Gates, 462 U.S. at 238 (referring to "practical people formulat[ing] certain common-sense conclusions about human behavior"). See also United States v. Burka, 700 F. Supp. 825, 828 n.2 (E.D. Pa. 1988) (sustaining challenge to warrant even though affiant's testimony at suppression hearing revealed factual inaccuracies in supporting affidavit).

2.      **Particularity Requirement**

The defendants' particularity argument is similarly unpersuasive. The Fourth Amendment provides that "no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." There is no prohibition of "searches for long lists of documents or other items provided that there is probable cause for each item on the list and that each item is particularly described." Ninety-Two Thousand, 307 F.3d at 148. In order to invalidate a warrant as general, it must "vest the executing officers with unbridled discretion to conduct an exploratory rummaging through [defendant's] papers in search of criminal evidence." United States v. Christine, 687 F.2d 749, 753 (3d Cir. 1982).

The warrant in question authorized the search for and seizure of, *inter alia*, cocaine and/or methamphetamine or other controlled substances, narcotics proceeds, narcotics ledgers, cutting agents, packaging materials, customer and supplier lists, financial records, recorded telephone messages, communication devices, telephone bills, financial instruments, jewelry, airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, firearms and other weapons, and indicia of occupancy. See Attach. B. to Warrant (Docket Document No. 306-2 at p. 14). The supporting affidavit set forth the probable cause that such materials would be found at the residence to be searched, including that narcotics traffickers use such items in carrying out their illegal activities, Aff. of Paul Varghese at 2-3, and the reasons to believe that suspected narcotics trafficker Humberto Preciado-Avila resided at the residence to be searched. Id. at 8-9. Given the particularized list of items to be seized and the reasons in the accompanying affidavit supporting probable cause that the items would be found at the Fontana residence, the

8

Court is convinced "that reasonable officers could have easily believed that the warrant was not...overly broad with respect to the categories of items to be seized," Ninety-Two Thousand, 307 F.3d at 149, and thus reliance on the warrant was objectively reasonable.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : CRIMINAL ACTION |
| vs. | : |
| | : NO.  06-CR-582-3, 4 |
| HUMBERTO PRECIADO-AVILA and | : |
| | : |
| PEDRO GUTIERREZ | : |

## **ORDER**

_____AND NOW, this 12th day of September, 2007, after oral argument, it is hereby ORDERED that defendant Pedro Gutierrez's motion to suppress items seized from the Fontana residence (Document No. 305), in which defendant Humberto Preciado-Avila joins, is DENIED.

BY THE COURT:

/s/ Thomas M. Golden
THOMAS M. GOLDEN, J.